Mintie Cartwright **KARDELL** et vir, et al., Appellants,

v.

Louis **CROUCH**, Appellee.

No. 10659.

Court of Civil Appeals of Texas.

Austin.

May 20, 1959.

Rehearing Denied July 15, 1959.

Second Motion for Rehearing Denied Aug. 5, 1959.

Looney, Clark, Mathews, Thomas & Harris, J. Sam Winters, Austin, for appellant.

Tom Moore, Lockhart, for appellee.

HUGHES, Justice.

This suit is in the form of trespass to try title. It is in reality a boundary case.

Appellants, who were plaintiffs below, are Mintie Cartwright Kardell and husband, Steven C. Kardell, A. I. Cartwright, Wilma Cartwright, Ralph Sharp, Sally Sharp Hall and husband R. B. Hall, Baxter P. Cartwright, all of San Augustine County, A. H. Cartwright of Hill County, Mary Sharp Smith and husband Phil Smith of Taylor County, Holman Lane Cartwright, Bess Cartwright Roberts and husband Fred Roberts all of Jefferson County, C. J. Cartwright and Lena Preston of McLennan County, Grace W. Cartwright, individually and as Trustee for E. B. Cartwright Trust, of Parker County, Sally Williams and husband James C. Williams and Robert Cartwright, all of Dallas County.

The defendant, appellee, was Louis Crouch of Caldwell County.

Mrs. Mintie Cartwright Kardell was alleged to own the surface of and she and the other appellants were alleged to own the minerals in and under a tract of land situated in Caldwell County containing 183.8-plus acres of land "being a part of the Mintie Cartwright Kardell et vir, et al. land in the Narsies Monet Survey No. 43, in Caldwell County, Texas."

Trial was nonjury and was conducted in accordance with the following stipulations made by the parties:

1. Appellants own the title to certain land situated in the Narsies Monet Survey No. 43 in Caldwell County.

2. Appellee owns the title to certain land situated in the John Talbot Survey No. 42 in Caldwell County.

3. The Monet and Talbot surveys are contiguous, i. e. the N.E. (northeast) line of the Talbot Survey and the S.W. (southwest) line of the Monet Survey separate the two surveys and is a common line.

4. The land sued for is claimed by the respective parties to be within the survey in which they own land.

5. These stipulations are not to be construed as fixing the location of the common line separating the Monet and Talbot surveys.

The court rendered judgment for appellee and upon the request of appellants made and filed the following findings of fact and conclusions of law:

"Findings of Fact

"1. The Court finds that on the 3rd day of December, 1953, the General Land Office of the State of Texas issued a corrected patent based upon corrected field notes, and in said patent the entire Talbot Survey is described as follows:

"Beginning at the Northeast corner of the John Talbot Survey No. 42, same being the Northwest corner of the Bernard Klekamp Survey No. 41. From this corner the original Post Oak called for at the Northwest corner of said Klekamp Survey No. 41 bears N 70 E 20 varas.

"Thence with the Southeast line of Survey No. 42, same being the Northwest line of the Klekamp Survey No. 41, South 25 West 4872.6 varas to the Southeast corner of the Talbot Survey, same being a point in the extension of the Old Colony Line Road, from which a 12″ Post Oak marked X bears North 27 49 West 14.4 varas and a 14″ Post Oak marked X bears South 85 30 West 8.7 varas.

"Thence with the Old Colony Line Road, same being the Southwest line of this Survey, North 45 West 5038.3 varas to the Southeast corner of the Moses Gage Survey No. 26 from which a 14″ Post Oak marked X bears North 25 25 East 17.3 varas and a 12″ Post Oak marked X bears North 17 15 West 17.2 varas, said point being the Southwest corner of this Survey from which the original Southwest corner of the John Talbot Survey bears North 45 West 2761.7 varas;

"Thence with the Southeast line of the Moses Gage Survey, North 30 East 3550.0 varas to the Northeast corner of the Moses Gage Survey, same being the Southwest corner of the Narcis Monet League. From this corner the original Northwest corner of the John Talbot Survey bears North 60 West 2673.2 varas.

"Thence, with the Northeast line of Survey No. 42, same being the Southwest line of the Narcis Monet League, South 60 East 4442 varas to the place of beginning.

"2. The Court finds that the 183.866 acres of land in question are included in the above described corrected survey and patent issued by the General Land Office of the State of Texas.

"3. The Court finds that the Plaintiff has not established a title by limitation.

"4. The Court further finds that a common boundary between the adjoining owners was not agreed to either expressly or implied.

"5. The Court further finds that the old fence line relied upon by Plaintiffs in no way establishes the correct boundary line between the Monet and Talbot Surveys, as claimed by the Plaintiffs.

"6. The Court further finds that it is bound by the corrected field notes as established by the resurvey and Patent which was issued by the General Land Office of the State of Texas, as aforesaid.

"Conclusions of Law

"The Court therefore concludes, as a matter of law, that the Plaintiff take nothing."

Appellants' objections and exceptions to these findings and conclusions were overruled and their request for additional findings was denied.

We insert below a working sketch prepared by the General Land Office showing the involved surveys and on which the area sued for has been identified by the parties as lying within the letters A G F E:

WORKING SKETCH OF SURVEYS IN

# CALDWELL CO.

## GENERAL LAND OFFICE---AUSTIN, TEXAS.

— BILL ALLCORN — COMMISSIONER —

Scale 1 in = 500 Varas Feb 25, 1958 O G K

This area was fenced by appellee about 1953, shortly after the purchase upon which his claim is based.

The Narsies Monet Survey was surveyed October 12, 1845.

The John Talbot Survey was surveyed January 26, 1846.

The Bernard Klekemp Survey was surveyed February 10, 1847.

While the Monet appears to have been surveyed before the Talbot and Klekemp its (Monet) original field notes call to begin "at the N.E. corner of Survey No. 41" the Klekemp. The Talbot also calls for the Klekemp.

The Talbot and Klekemp Surveys were surveyed by John Harvey and the Monet by R. Sims, however, John Harvey as County Surveyor of Bastrop County certified to the correctness of the Monet field notes June 17, 1846.

As we view the case made by the stipulation of the parties and the evidence it is not of controlling importance that the seniority of the Monet, Talbot and Klekemp surveys be determined.

 It is the contention of appellants that the location of the common line between the Monet and the Talbot is controlled by the proper location of the N.E. corner of the Talbot and the N.W. corner of the Klekemp, a common corner, which location is, they contend, established at point "A" on the above sketch.

The contention of appellee is that this same corner, N.E. Talbot and N.W. Klekemp, is located at point "G" on the above

sketch, about 1950' north of sketch point "A".

Appellee also relies upon the weakness of the case made by appellants.

The original field notes of the Talbot call [W.][1] to commence "Beginning on the N.E. corner League No. 41" [Klekemp].

The original field notes of the Klekemp are not in the record. From the patent to the survey issued in 1847, we find this call: "Thence N 60° West 4000 varas to the S. E.[2] corner of League No. 42, a stake, from which a Post Oak marked X bears North 70° East 20 varas, a Black Jack bears North 60° West 4 varas."

League 42 is the Talbot and the above call is for the beginning corner of the Talbot at the N.W. corner of the Klekemp.

The Talbot was resurveyed in 1953 by T. A. Breeze and has the beginning call as follows:

"beginning at the North East corner of the John Talbot Survey No. 42, same being the North West corner of the Bernard Klekemp Survey No. 41. From this corner the original Post Oak called for at the North West corner of said Klekemp Sur. No. 41 bears N 70 E 20.0 varas."

The Klekemp was resurveyed in 1912 by J. D. Chapman, County Surveyor of Caldwell County. His field notes call for the N.W. corner of the Klekemp and the N.E. corner of the Talbot in this language:

"Thence S 25 deg. W 290 varas to a stake on the old Blazed line recognized as the dividing line between League 41

1. The evidence shows that early-day surveyors were not certain where north was and that as a result directions were sometimes confused.

2. The evidence shows that the N.E. corner of League 42 was the intended call.

and Narcis Monet League, Thence N 60 deg. W 4000 varas with old Blazed line to a stone for N.W. corner, this Survey (No. 41) and League 42 made for John Talbot a P. O. marked X bears N. 70 E 20 varas, a B.J. Brs N 60 W 4 varas * * *"

Mr. E. A. Goodman, a witness for appellants, was 82 years of age at the time of trial. He had lived in the vicinity of the area in dispute for about 80 years. He had lived on lands in the Monet Survey for about 47 years.

Mr. Goodman testified that he helped Mr. Jim Chapman survey the Klekemp (known as the Bullies tract). He thought the time of this survey was in 1920 but it could have been in 1912. We quote from Mr. Goodman's testimony:

"Q. * * * Do you know whether or not there has been for a number of years a line along the—I mean a fence line along the North line of the Klekemp Survey? A. You mean West of the Bullies tract of land?

"Q. I am talking about the North line. A. The North line of the Bullies land.

"Q. Yes, sir. Has there been a fence along that line for a long time? A. Yes.

"Q. How long a time would you say there has been a fence there? A. Well, of course, I couldn't really know exact, but I would say that fence was there, I know, something like five or six years before I moved to that country; I moved there in about 1911.

* * * * * *

"Q. Can you tell me whether or not, Mr. Goodman, that line has been the recognized line separating the

Monet Survey from the Klekemp Survey. A. That is right.

"Q. And has it been recognized in the community as such? A. Right.

* * * * * *

"Q. And it has been a commonly recognized and agreed line by the old-timers that lived out there that the line where the fence is separates the Monet from the Klekemp. A. From the Klekemp.

* * * * * *

"Q. The surveyor has testified in Court today that this is the line you pointed out to him as the North line of the Klekemp; do you remember going out there and showing him a line being the North line of the Klekemp? A. Yes.

"Q. And at this point right here that is marked 'A' corner, would be the Northwest corner of the Klekemp; do you remember pointing that out to him? A. Yes.

* * * * * *

"Q. Do you remember in your time whether there was any fence or is there any fence line running as a continuation of the North line of the Klekemp on a westerly direction? A. Straight through.

"Q. Is there a fence line there now? A. Well, not—there are some posts there now.

"Q. Not any wire on it? A. Not any wire on it.

* * * * * *

"Q. What I am asking you about is what evidence of a fence? Was there any wire or any posts or anything? A. Well, there was some wire

there; it didn't go down there very far.

"Q. Was it imbedded in any trees? Was the wire imbedded in any trees?

Do you remember? A. I think in places, yes.

"Q. That was on the line separating the Monet from the Talbot, was it not? A. Yes.

"Q. The original survey notes for this Northwest corner of the Klekemp called for a post oak tree to bear North 70 degrees East 20 varas. A. It is not there.

"Q. It is not there now. A. Died and fell down and left a stump there and the roots got afire and burned the stump out and there is no sign of that there. I think now, I think old man Looke Taylor, when he fenced it, kind of put a blaze on a blackjack substituting that tree.

"Q. About when did that original witness tree that you are talking about did it fall down or burn or whatever happened to it? A. Well, now, I couldn't tell you that. But I had seen it there when I use to live over Tillman Road in there and rode after cattle. When I moved down there I was out in there and I seen it was down, but I couldn't say how long it had been down. But it was just broke off.

"Q. Would it have been in the late teens or early twenties? A. Well, I imagine around about twenty.

"Q. Around 1920? A. Yes.

"Q. And there is no evidence of that tree there at all? A. Not at all. The last time I was up there I couldn't see no sign of it whatever.

"Q. Somebody marked a blackjack tree— A. I think old man Looke Taylor done that, I think, when he fenced that land. I am not for sure that he done that, but I think so.

"Q. All right. A. Anyhow they marked it for a substitute for the corner.

* * * * * *

"Q. Ask you if this tree I am pointing to which is shown as broken off is the blackjack tree that you say was marked as a substitute witness tree. A. Yes, sir, I think that is it. This is the corner, isn't it?

"Q. This is the corner, yes. A. That is it, that direction.

* * * * * *

"Q. Do you also remember, Mr. Goodman, that at one time there was a little blackjack 60 degrees West 4 varas? There was a witness tree there? A. There was a little tree there all right, but now I—

"Q. That would put it right in here, Mr. Goodman. A. Yes, back on the—

"Q. On the West side. A. Yes, sir; yes, sir.

"Q. An extension of this line. A. Yes. An extension of that line, yes, West.

"Q. Do you remember a blackjack tree at one time there? A. Yes.

* * * * * *

"Q. I am going to hand you Plaintiffs' Exhibit 13, which the surveyor, Mr. Wahl, says he took as a close-up picture of the blackjack which is the substitute witness tree, and ask you— A. That is it right there.

"Q. That is it. A. That has got that long blaze on it.

"Q. And that tree is broken off, is it not? A. Broken off.

\* \* \* \* \* \*

"Q. In other words, this line from 'A' to 'E' [sketch] is a recognized line separating those two surveys. A. Yes, sir."

We insert below a picture of the substitute blackjack taken from sketch point "A":

On cross examination Mr. Goodman was questioned further about the tree pictured above. We quote:

"Q. These old marking trees that you are talking about or the old bearing trees that you are talking about, is that on the line as surveyed by Mr. Chapman? A. Yes, sir, they are the line; just pointed it out, there is a corner tree right there.

"Q. There is a corner tree right there, and that is the tree you are referring to? A. That is the tree that is gone.

"Q. The tree that is gone now. A. Another tree out there pretty nigh in the same direction marked for a substitute tree.

"Q. That was the tree, I believe you said, that Mr. Chapman or someone there marked. A. Old man Looke Taylor he leased that land and fenced it. The first fence come through there was when he leased it and fenced it. He got there and turned that corner he kind of blazed that tree.

"Q. Yes. A. It is more of a blaze, it is not a cross or anything like that, blackjack tree.

"Q. You don't know then of your own personal knowledge then that this line that ran through there, Mr. Goodman, was the original survey line through there then? A. Well, that is what they called it, the old original line, straight through.

"Q. And that is the line that Mr. Chapman surveyed out— A. Yes."

The original field notes of the Talbot call for its east line to coincide with the west

line of the Klekemp. The distance called however is 270 varas short of the Klekemp call for the same line. Such original field notes then make a call west with the S. W. boundary line of Bastrop County and the N.E. boundary line of Gonzales County to the S.W.(E) corner of League 26, Moses Gage. The next call is "Thence N. 30 deg. W 3134 varas with the south (east) boundary line of League No. 26 to the N.W. (S.W.) corner of League No. 43 (Monet)" and thence with the west (south) boundary line of League 43 to the place of beginning.

The corrected field notes of the Talbot, referred to above, call for the south line of the Monet in this language:

"Thence with the South East line of the Moses Gage Survey, North 30 East 3550.0 varas to the North East corner of the Moses Gage Survey, same being the South West corner of the Narseis Monet League * * * Thence with the North East line of Survey No. 42, same being the South West line of the Narseis Monet League, S. 60 E. 4442.0 varas."

Mr. Louis Wahl, a State-registered Public Surveyor, whose qualifications were stipulated, testified for appellants at considerable length. He failed to find the original witness trees at the N.W. corner of the Klekemp but saw the dead blackjack at the approximate location of the original post oak. He said there was a fence line along the north line of the Klekemp and that it appeared that a fence along such line had been there for a long time. He also testified to the reputation in the community as to the location of the dividing line between the north line of the Talbot and Klekemp and the South line of the Monet and that the corner at sketch point "A" was recognized as the N.W. corner of the Klekemp and the N.E. corner of the Talbot.

An aerial map introduced in evidence by appellants confirms the existence of the fence line along the claimed dividing line between the Monet and Talbot-Klekemp surveys.

Mr. Wahl surveyed the west line of the Klekemp starting at sketch point "A" S. 25 degrees west 5200 varas. This line is marked with a fence for the entire distance. When he measured this distance, he arrived in the creek and 71.1 feet south of the southwest corner of the Klekemp as fenced. This variance is not unusual. By starting at the corner described as northwest corner of the Klekemp, he reached what he believed to be the southwest corner of the Klekemp.

He further testified that the Talbot and Monet both overlap the Gage, a senior survey, to the west. He located the recognized northwest corner of the Monet. He ran a line from this point to the recognized south line of the Monet. The field notes of the Monet call for this distance to be 2809½ varas. He surveyed this distance to be only 30 feet short of the distance called for in the original field notes.

With regard to the west line of the Klekemp its patent calls for such line to extend south 25 degrees west 5200 varas to the county line and the original field notes of the Talbot call its east line to extend S. 25 degrees W. 4930 to the Klekemp corner and thence with the county line. The two surveys thus call for the same corner.

The resurvey of the Talbot calls for its east line to extend south 25 degrees West 4872.6 to its S.E. corner "same being a point in the extension of the Old Colony Line Road." Bearing trees called for at this point (sketch point I (script h)) were found and identified but there is no evidence that the Old Colony Road was at that point.

Mr. J. R. Gray, a witness for appellee, testified that the S.W. corner of the Klekemp is on a sandy bar in Peach Creek and to get to this point you go on an old road, called the Old Colony Road. Mr. Wahl placed this road and creek at sketch point "B".

Mr. Wahl testified that the distance from sketch point "G" (N.E. corner of tract in suit) to sketch point "I" (script h) is very close to the distance called for by the resurvey of the Talbot for its east line.

He testified further that the distance from sketch point "I" (script h), S.W. corner of Talbot as resurveyed, to sketch point "B", S.W. corner of the Klekemp is 2770 feet. According to the patent of the Klekemp and the original field notes of the Talbot this distance should be 270 varas or 750'.

The significance of this discrepancy is that the corrected patent of the Talbot purports to begin at the corner originally called for but in applying the corrected field notes to the ground it is obvious that he failed to commence at the proper ground location.

Further evidence of this error in the resurvey of the Talbot is that Mr. Wahl testified that he had found what he thought to be the bearing tree taken by Breeze in his resurvey of the Talbot as the original Post Oak called for at the N.W. corner of the Klekemp bearing from such corner N. 70 E. 20.0 varas. The tree found by Mr. Wahl was in the vicinity of sketch point "G", the point appellee uses as the N.E. corner of the Talbot and the N.W. corner of the Klekemp. The course the found tree bears from such corner is not identical with the original course called for and the distance from the corner is 14.5 varas rather than the called for distance of 20 varas. More important is the fact that the found tree is a forked tree and the original field notes do not call for a forked tree although it would have been customary for a surveyor to have given such description if correct. More important still is the testimony of Dr. B. C. Tharp, Professor Emeritus of Ecology of the University of Texas, to the effect that the found tree could not have been of sufficient age and size to have been marked as a witness tree when the Talbot was originally surveyed. In fact Dr. Tharp questioned its existence at all at such time.

Surveyor Wahl testifying about the Klekemp stated that he could not locate on the ground the beginning corner of such survey as described in the original field notes or as described by Mr. Chapman in his resurvey, nor could Mr. Wahl find any of the corners described by Mr. Chapman. He only found the old fence line on the recognized dividing line between the Klekemp and the Monet which as he stated "keeps you from getting lost."

None of the evidence introduced to establish the facts above recited was objected to by appellee. For this reason we will not discuss its relevancy or cogency but merely cite State v. Gulf Oil Corporation, 264 S.W.2d 743, Waco Civil Appeals, writ ref. N.R.E., to the effect that titles to land will not fail merely because old markers have disappeared and the footsteps of the original surveyor may be difficult to trace and that in such cases and after the long lapse of time any evidence which is the best evidence available tending to establish the footsteps of the original surveyor is admissible for such purpose. Such evidence as to ancient boundaries includes evidence of common reputation.

Corroborating and confirming the location of the disputed line in accordance with the contention of appellants is the testimony of appellee who testified as an adverse witness, some of which we quote:

"Q. Don't you know that fence corner there at point 'A' has been on the ground for many many years? A. That is right.

"Q. You could have found that, couldn't you? A. I could.

"Q. Didn't you know there was a fence line along the North line of the Klekemp? A. Yes.

"Q. Didn't you know that was the recognized line between the Monet and the Klekemp? A. Well,—

"Q. Tell me the truth. A. That is right.

\* \* \* \* \* \*

"Q. You knew when you bought this property that the North line of the Talbot was the extension of the North line of that fence line on the North side of the Klekemp, didn't you? A. I think you are right as far as any lines out in that whole country, I don't think there is any of them on the right place, if you want to know the truth about it, and I never have.

\* \* \* \* \* \*

"Q. But you knew when you bought this property that this line right here, which is an extension of the North line of the Klekemp— A. That is the recognized line—

\* \* \* \* \* \*

"A. Bound to be. Sure it is.

\* \* \* \* \* \*

"Q. You bought some property down in the Talbot from MH Reed Estate, didn't you? A. Yes.

"Q. That was one or more of those subdivisions or partitions of the John Talbot estate, isn't that right? A. That is right.

"Q. The North lines of those lots you bought from MH Reed Estate run North to this recognized line of the John Talbot, didn't they, when you bought them? A. Well, no, they called for the Monet.

"Q. They call for the South line of the Monet. A. South line of the Monet. Everything I got called for the South line of the Monet.

"Q. When you bought that property from MH Reed Estate, this line here, which is a continuation of this line 'AE', isn't it, as shown on Plaintiffs' Exhibit No. 10, was the line which was recognized by everyone at that time as being the South line of the Monet. A. I am sure that is right."

We now turn our attention to appellee's brief. Much of it is devoted to his cross examination of Mr. Wahl for the purpose of showing that he had not made a complete or completely accurate survey. Mr. Wahl admitted that he did not shoot Polaris or run plumbbobs explaining that "A man couldn't pay a surveyor enough money to do that in that much land. The land isn't worth it." Mr. Wahl testified as reflected in appellee's brief in part as follows:

"Q. You think you did good surveying out there or just did it to check it? I believe it is your testimony that you did not make an accurate survey or anything? A. I think I did as close as anybody would.

"Q. Yes, sir, but is it good? Is it accurate? A. I think so.

"Q. You think so to the extent of what you did. A. Yes, sir.

"Q. You didn't do enough to accurately check it, did you? A. That may be true.

"Q. You didn't do enough to accurately check it. Actually just one other question. There is a conflict in the Monet and Talbot, is there not? A. Yes.

"Q. And it has been there for a long time, hasn't it? A. Yes, sir.

"Q. Since Mr. Goodman testified to it, you testified there has been a conflict in the Klekemp and the Monet; actually all you did, you just took the old line through there, the old fence line through there and just checked some distance on that old fence line. A. Yes.

"Q. That is absolutely all you did. You just went on the original assumption then that this was a correct line, and then chained some distances out. A. Yes, sir, got it proved out.

"Q. By trying to prove it out by distances rather than by natural objects,— A. Yes, sir.

"Q. —roadways or anything else. A. Yes, sir, and as it was occupied on the ground.

"Q. As it was occupied on the ground, not at the time the original surveys were made. As a practical matter now, wasn't this map made to testify all the errors in these original surveys out here? Didn't they change this line here to South 30 West, didn't it read South 30 East on the field notes? A. Yes.

"Q. So they just took what they thought was right and put this together and it has no semblance of accuracy, does it, according to the original field notes? A. Yes, sir.

"Q. Someone just got it up there and tried to justify—the fact of the business is all these beginning corners, you took the correct beginning corners they call for, you would be on the other side of the survey that you were actually looking for, wouldn't you? A. That is right.

"Q. They have got all of them upside-down. A. That is right.

"Q. It is just a big conflict out there and that is all it is. A. That takes care of all of them.

"Q. That takes care of all of them, and just the only thing in the world you can go on, just run some lines out there. A. Yes, sir.

"Q. And in 1951 or 1952 or 1953, there were not any fence lines in here. A. I wouldn't think so.

"Q. Actually you haven't established any original marking corners out there. A. No, sir.

"Q. Or any original objects, just occupation, just got some occupational marks out there. A. Right."

Mr. Wahl was subjected to searching and critical cross examination and he may have weakened some in the face of it. It is true that the area in which these lands lie is sandy and rough and of relatively small value. It is also true that many of the surveys are in apparent conflict. The appreciable conflict of the Talbot with the senior survey Gage on the West was the occasion for the resurvey and repatent of the Talbot. It is also true that Mr. Wahl did a minimum amount of surveying and may not have used the most approved methods for accurate surveying. Certainly Mr. Wahl should not be criticized for this. He did, so far as the record discloses, all that he was employed to do and as accurately as circumstances warranted.

The questioning of Mr. Wahl and Mr. Goodman brought out that there were conflicting calls between the patent field notes and the Chapman resurvey of the Klekemp. This conflict is made the subject of specific discussion by appellee in his brief a portion of which we quote:

"Appellants go to great lengths and base much credit and faith on the testimony of Mr. Goodman who says that he was a chain bearer for Mr. Chapman in the resurvey of the Klekamp. Certainly, Mr. Goodman and Mr. Chapman did not follow the original field notes when making the resurvey as they ran a call of S 25 W 290 vrs, when the original field notes of the Klekamp call for a course and distance of N 25 E 250 vrs. This variance on the survey of Mr. Chapman and the original field notes of the Klekamp makes a total distance of 510 varas in marking the true division line between the Talbot and the Monet Survey and is the crux of this law suit: with it falls the law suit of the Appellants."

The original patent field notes of the Klekemp, read in part:

"*Beginning at the N.E. [N.W.] corner of League No.* * * *, survey-*

*ed for S. Hazlet,* a stake, from which a Post Oak marked H bears North 65 West, 10 varas, another marked X bears South 30 deg. West 35 varas.

"Thence North 65 deg. West, 600 varas to N.W. [S.W.] corner of League No. 35, a stake, from which a Post Oak marked X bears South 8 deg. East 9 varas, another bears South 80 deg. West at 14 varas.

"Thence *North 25 deg. East two hundred and fifty varas* to a stake on the N.W. boundary line of League No. 35, a stake from which a Black Jack bears North 43 deg. West 6 varas, a Post Oak bears South 18 deg. West 10 varas.

"Thence North 60 deg. West 4000 varas *to the S.E. [N.E.] corner of League No. 42, a stake, from which a Post Oak marked X bears N. 70 deg. East 20 varas, a Black Jack bears North 60 deg. West 40 varas."* (Italics ours.)

The field notes of the Klekemp made by Mr. Chapman in 1912 read in part as follows:

"Beginning at a Post the N.W. corner of the Samuel Haslett and the N.E. corner of said Lea. 41, a P. O. stump brs. S. 30 deg. W. 35 varas;

"Thence N. 65 deg. W 600 varas, a stake for the corner of the Bailey Hardeman Sur.;

"Thence *S 25 deg. W. 290 varas to a stake on the Old Blazed line recognized as the dividing line between League 41 and Narcis Monet league;*

"Thence *N. 60 deg. W. 4000 varas with Old Blazed line to a stone for N.W. corner, this survey (No. 41) and League 42 made for John Talbot a P. O. marked X bears N. 70 E. 20 varas a B. J. brs. N. 60 W. 4 varas* * * *"* (Italics ours.)

It is obvious that one of the surveys is in error. Both begin at the same point then they both go "North 65 deg. West 600 varas." The next call is the departure. The patent call is "North 25 deg. East two hundred and fifty varas" and the Chapman call is "S. 25 deg. W 290 varas" yet the succeeding call in both the patent and Chapman field notes is "North 60 deg. West 4000 varas" and the terminus of these calls is the same, N.W. corner of Klekemp and N.E. corner of Talbot, which is identified and located on the ground by the undisputed evidence.

It is thus apparent that the mistake was made by Chapman. It would have been impossible for him to have reached the identified line for which he called by honoring his call "S. 25 deg. West 290 varas." The evidence bears this out.

Mr. Wahl testified:

"Q. Yes, sir, this line that Mr. Chapman run through there pulled it down 540 varas from the original line, didn't it? A. But the Chapman notes were never used.

"Q. You were in here when Mr. Goodman testified that this old fence line through there was the one that Mr. Chapman run through there and that he helped him. A. Yes, that is true, but the notes that are being used on the ground are the notes that the original patent called for.

"Q. You made much-to-do about this fence through there. Are you forgetting about the fence now? A. No.

\* \* \* \* \* \*

"Q. Then which way? A. Then according to Chapman's notes, recorded notes, he goes South 25 West 290 varas.

"Q. Did you go down there and try to find any corner or any bearing trees or anything? A. No.

"Q. Why didn't you? A. Well, that is just out in open road and you couldn't find anything in the open road.

"Q. That is what I have been trying to talk about about all these bearing trees. The fact of the business is that either you or Mr. Chapman was wrong, because you all are both talking about this old corner through there; either you or Mr. Chapman were wrong, weren't you, on the ground? A. On the ground this fence here, that keeps you from getting lost.

 \* \* \* \* \* \*

"Q. The defendant has offered in evidence a resurvey of the Klekemp Survey, and he has asked you some questions about it, being marked for identification Defendant's Exhibit No. 3; now then, in the resurvey of the Klekemp by Mr. Chapman in 1912, shown as Defendant's Exhibit No. 3, instead of starting, it starts at a point which is the Northwest corner of the Hayslitt and then runs North 65 degrees West 600 varas and then, instead of going up North 25 degrees East, it goes South 25 degrees West, isn't that right? A. Reverse the call, in other words.

"Q. Reverses the call and instead of being 250 varas, it calls for 290 varas; you see that call in the field notes? A. Yes, sir. Thence 25 degrees West 290 varas.

"Q. Read that for the Court where it says thence South 25 degrees West, 290 varas, and read on from that. A. Thence South 25 degrees West 290 varas to a stake on an old blaze line recognized as the dividing line between League 41 and North Monet League, thence North 60 degrees West 4000 varas with an old blaze line to a stone for Northwest corner. This Survey No. 41.

"Q. All right. A. League 42 made for John Talbot a post oak mark-

ed X bears North 70 degrees East 20 varas to blackjack bears North 60 degrees West 4 varas.

"Q. The field notes of the resurvey of the Klekemp made in 1912 called for the old blaze line separating the Klekemp from the Monet, did it not? A. Yes, sir.

"Q. They call for the same initial corner, which is corner 'A' on Plaintiffs' Exhibit No. 10, is that right? A. Yes.

"Q. That indicates to you that when Chapman started this amended resurvey, that he started up here above where is point 'C' rather than down here; in other words, he came down South 25 degrees West 290 varas to get to the old blaze line, did he not? A. Yes.

"Q. In order to do that he had to start North of the old blaze line, did he not? A. If he found the old blaze line he did."

█ Without exploring the effect of the Chapman resurvey upon the Klekemp patent we follow the holding of this Court in Harwell v. Sloane, Tex.Civ.App., 230 S.W.2d 558, 561, writ ref., N.R.E., where we said:

"In the case of Gregg v. Hill, 82 Tex. 405, 17 S.W. 838, 839, no actual survey had been made of the Moore Survey, and the second call was 'south 3,254 varas, to the south-west corner of the "S.P.R.R. survey No. 95"' the testimony showing that the corner called for could not be reached by such call. The court held: '* * * It is proper, therefore, to ignore the call for the south-west corner of the survey No. 95. This survey was evidently called for through mistake. The north line of the Moore survey being established and identified, the remaining lines should be established by course and distance, though this may involve

a disregard for another survey called for through mistake."

The Chapman call "S. 25 deg. W. 290 varas" is a false call and should be rejected.

It is our opinion that the evidence conclusively shows that the lands sued for lie within the Monet survey. Appellee has offered no parol evidence of a locative nature which contradicts or impeaches the verity of the facts which we have recited above. The only parol evidence which he offered was that of J. R. Gray who testified that he had been familiar with the Cartwright area since about 1915 and knew the location of the Crouch lands. He testified that Mr. Crouch did some fencing about five years ago. He was asked: "Prior to that time that Mr. Crouch fenced that in, were there any other fences around through there?" and he answered: "I don't think so." On cross examination Mr. Gray testified that he knew of fences on the north and west lines of the Bullies pasture (Klekemp). He also testified:

"Q. For the purpose of this question, assume that this is that North line of the Bullies Pasture, this line right here running east and west—this is the North line of the Bullies Pasture running East and West. A. Yes.

"Q. You have been on down to the West on that corner, haven't you? A. Oh, I don't know I followed them lines out or not.

"Q. Did you ever see any evidence of any old fence line, wires grown in trees, or anything like that? A. I don't believe I have, but I wouldn't be sure about that. There are people down there, they use to, they didn't own that land, they didn't pay any taxes on it, and they just run it to suit themselves. Old man Looke Taylor down there, he run some fences down there just to keep his own cattle from going away on down."

In our opinion the testimony of Mr. Gray is not sufficient to raise a fact issue regarding the existence and location of the old fence line recognized as the dividing line between the Monet and Talbot-Klekemp surveys. This is irrefutably correct when it is recalled that appellee testified without qualification that he knew there was a fence line along the north line of the Klekemp and that the north line of the Talbot was an extension of this line.

Appellee does not in his brief rest his case, as the Trial Court did, upon the resurvey of the Talbot. For this reason we will not indulge in further discussion of it except to say that in our opinion the Breeze field notes of the Talbot do not of themselves furnish any basis for locating the dividing line between the Monet and Talbot at sketch point "G" and to call attention to the facts recited above which demonstrate that such line was not so located.

We also believe that we have sufficiently answered the specific argument made by appellee in his brief and which he described as "the crux of this lawsuit," regarding the conflicting calls between the field note calls in the Klekemp patent and Chapman resurvey. When the mistaken call made by Chapman is disregarded as the law requires then no doubt remains concerning the line called for by both the patent and amended field notes. Such line is the line identified by the undisputed evidence as the line marked A to E on the sketch.

In accordance with these conclusions we reverse the judgment of the Trial Court and render judgment for appellants as prayed for by them.

Reversed and rendered.

On Appellee's Motion for Rehearing

 Appellee assigns as error our failure to hold that he had perfected title to the lands in suit under the three year statute of limitation. Art. 5507, Vernon's Ann. Civ.St.

If we are correct in holding that these lands are located within the Monet Survey then the three year statute of limitations is inapplicable even though appellee has had peaceable and adverse possession of such lands for three years prior to the institution of this suit for the reason that there is no evidence that such possession by appellee was under title or color of title as required by the statute. See 2 Tex. Jur. Adverse Possession, Sec. 156.

The motion is overruled.